UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOEMAN MUSIC GROUP MEDIA AND
PHOTOGRAPHY LLC,

                              Plaintiff,

        -v-

RAQUELLA "ROCKY SNYDA" GEORGE,

                              Defendant.

CIVIL ACTION NO. 23-CV-4776 (MMG) (RFT)

**REPORT AND RECOMMENDATION**

**TO THE HONORABLE MARGARET M. GARNETT, UNITED STATES DISTRICT JUDGE:**

**INTRODUCTION**

Plaintiff Doeman Music Group Media and Photography LLC commenced this action

against Defendant Raquella "Rocky Snyda" George and Defendants DistroKid, LLC and Kid Distro

Holdings, LLC (collectively "DistroKid"). (*See* ECF 4, Compl.) Plaintiff sought damages and

injunctive relief under section 512(f) of the Digital Millennium Copyright Act (the "DMCA")

against George and alleged fiduciary duty and implied covenant claims under New York law

against DistroKid. (*See* ECF 4, Compl. ¶¶ 128-44.) Your Honor referred this matter to me for an

inquest after default judgment against the sole remaining Defendant on the sole remaining

claim in this case – a claim against George under the DMCA for knowingly submitting

misleading Notice-and-Takedown ("Take-Down") requests to various streaming services. (*See*

*id.* ¶¶ 87-99.) Plaintiff seeks $117,717.00, consisting of (1) damages under the DMCA, 17 U.S.C.

§ 512(f), in the amount of $57,500.00; and (2) $57,490.00 in attorneys' fees, plus $4,102.00 in

costs (including the cost of DMCA counsel), for a total of attorneys' fees and costs of

$61,592.00. (*See* ECF 60, Proposed Findings of Fact and Conclusions of Law for Damages Inquest

Against Defaulting Defendant ("Proposed Findings") at 1, 12-17; ECF 69-2, Suppl. Grimm Decl.)

For the reasons set forth below, I respectfully recommend that judgment be entered against

George in favor of Plaintiff, with Plaintiff to be awarded $19,062.63, consisting of:

1. $360.63 in damages; and

2. $14,600.00 in attorneys' fees, plus $4,102.00 in costs, for a total of $18,702.00 in

   attorneys' fees and costs.

## BACKGROUND

### I.    Factual Background

On default judgment, the court accepts as true all the well-pleaded allegations of the

complaint to determine whether plaintiff sufficiently alleges liability as a matter of law. *See*

*Henry v. Oluwole*, 108 F.4th 45, 55 (2d Cir. 2024); *see also City of New York v. Mickalis Pawn*

*Shop, LLC*, 645 F.3d 114, 137 & n.23 (2d Cir. 2011) (explaining that on default judgment a

district court must find that plaintiff's complaint states a valid claim for relief); *Lopez v. Emerald*

*Staffing, Inc.*, No. 18-CV-2788 (SLC), 2020 WL 915821, at *1 n.1 (S.D.N.Y. Feb. 26, 2020) (citing

*Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (relying on and accepting as true facts from

the plaintiffs' proposed findings of fact and conclusions of law, the plaintiffs' declarations, and

the plaintiffs' complaint)).[1]

Plaintiff is an independent record label that operates out of West Virginia. (ECF 4,

Compl. ¶ 64.) Damien Wilson aka "Frosty the Doeman" is a recording artist signed with

---

[1]      Unless otherwise indicated, this report and recommendation omits all internal
quotation marks, citations, footnotes, omissions, emphases, and alterations in quoted text.

Plaintiff's publishing group. (*Id.* ¶ 65.) In May 2020, Wilson began work on a new single titled "Scary Movie." (*See id.* ¶ 82.) After being introduced to George by a mutual friend, Wilson requested that she contribute a short vocal recording for Scary Movie. (*See id.*) Plaintiff paid George for her work and agreed to credit her on the song. (*See id.* ¶ 83.) In July 2020, Mr. Wilson uploaded an album to DistroKid, including the final version of Scary Movie, along with other songs unrelated to George. (*See id.* ¶¶ 85-86.)

After the release of Scary Movie, Plaintiff and George had a "personal falling out." (*Id.* ¶ 87.) George messaged Wilson on Instagram demanding that he remove her name from Scary Movie. (*See id.* ¶ 88.) George threatened to issue a Take-Down request if Wilson did not remove her name. (*See id.*) Wilson refused George's demand. (*See id.* ¶ 95.) Wilson asserted that he was the rightful copyright owner and that George could not submit a Take-Down request; George proceeded to block Mr. Wilson on Instagram. (*See id.* ¶ 96). On or before January 7, 2021, DistroKid notified Plaintiff of a Take-Down request. (*See id.* ¶¶ 98-102.) DistroKid removed Wilson's entire album from the streaming services to which it distributes. (*See* ECF 60, Proposed Findings ¶¶ 5-7.)

## II.    Procedural Background

Plaintiff filed this action on June 13, 2023, alleging that George had violated the DMCA, 17 U.S.C. § 512(f), by issuing Take-Down requests that knowingly and materially misrepresented Plaintiff's works as infringing. (*See* ECF 4, Compl. ¶¶ 140-44). Plaintiff also alleged breach of fiduciary duty and of the implied covenant of good faith and fair dealing against DistroKid. (*See id.* ¶¶ 128-39.)

Plaintiff effected personal service on George on October 21, 2023. (*See* ECF 24, Aff. of Serv.) George failed to appear or otherwise take any action in this case. On March 4, 2024, Your Honor issued an Order directing Plaintiff to move for default judgment. (*See* ECF 40, Order for Pl. to Move for Def. J.) On March 22, 2024, the Clerk of Court issued a Certificate of Default. (*See* ECF 43, Cert. of Default.) On March 26, 2024, Plaintiff filed their Motion for Default Judgment. (*See* ECF 46, Mot. for Def. J.)

Your Honor ordered George to appear on April 17, 2024, and show cause why a default judgment against her should not issue. (*See id.*; ECF 47, Order To Show Cause.) On March 29, 2024, Plaintiff served George with the Order To Show Cause and the Motion for Default Judgment. (*See* ECF 48, Cert. of Serv.) George failed to appear. On April 17, 2024, Your Honor granted Plaintiff's Motion for Default Judgment against George. (*See* ECF 49, Def. J. at 6.)

On April 17, 2024, Your Honor referred this matter to me for an inquest into damages after default. (*See* ECF 50, Order of Ref.) On April 23, 2024, I issued a scheduling order directing Plaintiff to file Proposed Findings by May 7, 2024 and to serve them on George. (*See* ECF 55, Order.) Plaintiff filed the Proposed Findings. (*See* ECF 60, Proposed Findings.) Plaintiff sought (1) damages under the DMCA, 17 U.S.C. § 512(f), in the amount of $60,400.00, (2) $52,740.00 in attorneys' fees, and (3) $1,202.00 in taxable costs, for a total award of $114,342.00. (*See* ECF 60, Proposed Findings at 1, 12-17.)

On September 30, 2024, Your Honor dismissed all claims against DistroKid without prejudice for lack of subject matter jurisdiction. (*See* ECF 63, Opinion and Order at 16.)

After reviewing Plaintiff's Proposed Findings, I determined the claimed damages were insufficiently supported. I ordered Plaintiff, by March 5, 2025, to make a supplemental submission further explaining the basis for its claimed damages. (*See* ECF 64, Order.)

Specifically, I ordered Plaintiff to identify each streaming platform that took down Plaintiff's song and the album that contained it due to George's Take-Down request; the streams on each such platform prior to the period that the music was unavailable on streaming platforms (the "Take-Down Period"), for the song and for the album; the method by which streaming revenue is calculated on each such platform; and the method that Plaintiff used for its damages calculations. (*See id.*) I also directed Plaintiff to provide documentation sufficient to identify any concerts at which Plaintiff's song was performed prior to the Take-Down Period; all performances that were lost during the Take-Down Period; and Plaintiff's method for calculating lost revenues from lost performances, if any. (*See id.*) Plaintiff filed its supplemental submission, which consisted of a declaration by Wilson as Plaintiff's representative (ECF 69, Suppl. Wilson Decl.), a declaration from club promoter Travon Carr (ECF 69-1, Carr Decl.), and a declaration from Plaintiff's counsel (ECF 69-2, Suppl. Grimm Decl.).

On September 11, 2025, I issued a second order to supplement, directing Plaintiff to (1) explains the legal and/or factual basis for tripling Plaintiff's calculated damage for lost streaming revenue for one song to account for Plaintiff's lost opportunity to promote its songs during the Take-Down Period; (2) explain how Plaintiff calculated $8,918.11 in damages for lost streaming revenue for the album; (3) explain the legal basis for Plaintiff's claim for lost performance revenue that would have been earned by Wilson; (4) explain the legal basis for Plaintiff's claim for wages that would have been earned by Wilson working at an unrelated business; and (5) provide any additional available invoices and similar documents substantiating Plaintiffs' requests for attorneys' fees and costs. (ECF 70, Order.) Plaintiff filed a supplemental brief on October 28, 2025. (ECF 77, Supp. Brief.)

**LEGAL STANDARDS**

### I.    Obtaining a Default Judgment

Rule 55 of the Federal Rules of Civil Procedure establishes the two steps to obtain a default judgment. *See generally* Fed. R. Civ. P. 55. When "a party against whom . . . relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). When the amount sought is not certain, or cannot be made certain by computation, the party seeking relief must apply for a default judgment. *See* Fed. R. Civ. P. 55(b)(2). To enter or effectuate judgment, the court may conduct hearings or make referrals to (1) conduct an accounting, (2) determine the amount of damages, (3) establish the truth of any allegation, (4) investigate any other matter to enter or effectuate judgment. *See id*. "[T]he court may . . . enter a default judgment if liability is established as a matter of law when the factual allegations of the complaint are taken as true." *Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015).

### II.    Determining Liability and Damages

A defendant in default "admits the well-pleaded factual allegations in a complaint," and the Court is "required to determine whether the plaintiff's allegations are sufficient to establish . . . liability as a matter of law." *Cummings v. Quick Start Day Care Ctr. Inc.*, No. 23-CV-5244 (LJL), 2024 WL 68552, at *2 (S.D.N.Y. Jan. 5, 2024). Your Honor found Plaintiff had adequately shown George's liability for knowingly making misrepresentations in her Take-Down requests in violation of Section 512(f). (*See* ECF 49, Def. J. at 5-6.)

"Once liability has been established, a plaintiff must provide admissible evidence establishing the amount of damages with reasonable certainty." *Reisman v. Ne. Power & Gas LLC*, 720 F. Supp. 3d 279, 291 (S.D.N.Y. 2024). The district court is not obligated to accept plaintiff's statement of damages during the inquest because a defendant defaults. *See Ramgoolie v. Ramgoolie*, No. 22-1409, 2024 WL 4429420, at *4 (2d Cir. Oct. 7, 2024) (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997)). The court must determine the appropriate damages based on the evidence because "[a] plaintiff's statement . . . of damages alone does not provide the requisite reasonable certainty." *RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.*, No. 12-CV-1369 (LGS) (AJP), 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013) (citing *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010), *report and recommendation adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013); *Agbaje v. Bah*, No. 09-CV-6201 (DLC) (RLE), 2010 WL 6370541, at *3 (S.D.N.Y. Dec. 23, 2010), *report and recommendation adopted*, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011). If a plaintiff fails to demonstrate its damages with reasonable certainty, the court should decline to award damages despite a finding of liability through default. *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012).

The Court proceeds without a hearing and determines that damages can be resolved on the submissions and prior proceedings. *Bus. Casual Holdings, LLC v. TV-Novosti*, No. 21-CV-2007 (JGK) (RWL), 2023 WL 1809707, at *5 (S.D.N.Y. Feb. 8, 2023) (holding that no hearing on damages is necessary when no party requests one).

7

**DISCUSSION**

I.    **Jurisdiction and Venue**

Because Plaintiff brought this action under the Copyright Act, subject-matter jurisdiction is properly based on 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338(a) (copyright jurisdiction).

The Court must determine whether it has personal jurisdiction over George, which is "a necessary prerequisite to entry of a default judgment." *See Ventarola v. Narvaez*, No. 18-CV-3231 (PMH) (BCM), 2021 WL 1536540, at *4 (S.D.N.Y. Feb. 16, 2021), *report and recommendation adopted*, 2021 WL 839454 (S.D.N.Y. Mar. 5, 2021). "Neither the Copyright Act nor the DMCA contains its own personal jurisdiction or service provision." *Reilly v. Plot Com.*, No. 15-CV-5118 (PAE) (BCM), 2016 WL 6837895, at *2-3 (S.D.N.Y. Oct. 31, 2016), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 160884 (S.D.N.Y. 2016). Thus, the Court must assess "whether the defendant is subject to jurisdiction under the law of the forum state – here, New York" and then "consider whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution." *Id.*; *see also* New York Civ. Proc. L. & R. §§ 301, 308(1). I am satisfied that the Court has personal jurisdiction over George because she is a citizen of New York State and because Plaintiff personally served her in Brooklyn, New York, on October 21, 2023. (*See* ECF 4, Compl. ¶ 6; ECF 24, Aff. of Serv.)

The general venue provision states that a civil action may be brought in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; or "(2) a judicial district in which a substantial part of the events or

omissions giving rise to the claim occurred"; or "(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b)(1)-(3). In alleging that venue is proper in this District, Plaintiff relies on subsection 1391(b)(2), which states that "a substantial part of the events or omissions giving rise to the claim occurred" in this District. (ECF 4, Compl. ¶ 9.) By defaulting, Defendant George waived any potential venue defect. *See Sawar v. James Motel, Inc.*, No. 21-CV-0027 (EK) (RER), 2022 WL 21817103, at *1 n.2 (E.D.N.Y. June 6, 2022) (explaining that defects in venue "are waivable and are deemed waived when a defendant defaults").

## II.    Liability

Your Honor found that Plaintiff sufficiently pleaded a claim against Defendant George under 17 U.S.C. § 512(f). (ECF 49, Def. J. at 5-6.)

## III.    Damages

Following a default, the Court must ascertain damages with reasonable certainty. *See Ramgoolie*, 2024 WL 4429420, at *3. "[A]ny person who makes knowing, material misrepresentations in filing a DMCA takedown notice shall be liable for any damages, including costs and attorneys' fees incurred by the alleged infringer . . . ." *Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1029 (N.D. Cal. 2015) (quoting 17 U.S.C. § 512(f)).

### A.    Damages for Lost Streaming Revenue

DistroKid distributed Plaintiff's song and album to over 60 streaming platforms. (*See* ECF 69, Suppl. Wilson Decl. ¶ 2.) Plaintiff claims it is unable to determine the precise number of pre-Take-Down streams for any platform other than YouTube; Plaintiff estimates $10,000.00 in lost

streaming revenue (including for lost revenues on YouTube). (*See id.* ¶ 3; ECF 60, Proposed

Findings ¶ 7.) DistroKid allows Plaintiff to view the cumulative revenue from Plaintiff's content,

broken down by streaming service and by song. (*See* ECF 69, Suppl. Wilson Decl. ¶ 3; *id.* at 12-

18.) Plaintiff elected to collect its own YouTube video revenues. (*See id.* ¶ 2.)

George's Take-Down requests targeted one song on Plaintiff's album but resulted in the

removal of Plaintiff's entire album. (*See* ECF 60, Proposed Findings ¶ 7.) Plaintiff initially claimed

that Scary Movie alone received more than 60,000 monthly streams on YouTube prior to

George's Take-Down request. (*See id.*) When Plaintiff reposted Scary Movie, it received 74,800

views in one month; Plaintiff estimates that this is the number of views per month the song

would have received if it had not been wrongfully not taken down. (*See id.*) Using this estimate,

Plaintiff concluded that Scary Movie lost $1,000 in streaming revenue over an unspecified

period, but Plaintiff did not connect how it calculated a $1,000 loss for Scary Movie based on

the number of estimated views. (*See id.*) Generalizing to the entire album, which had several

songs, Plaintiff estimated $10,000 of lost streaming revenue. (*See id.*)

In response to the Court's request for more clarity on the computations (ECF 64),

Plaintiff estimated between $481.90 and $600.00 of lost streaming revenue from the song

Scary Movie alone, calculated, using Scary Movie's Spotify streams as an example, as follows:

(Plaintiff's total streams to date on a comparable song less Scary Movie's total streams to

date)[2] * (an estimated $0.0018849628 per stream)[3] = $160.63. Plaintiff said that if one considers other streaming platforms, the additional lost streaming revenue for Scary Movie would be $200.00;[4] Plaintiff did not explain how it calculated the lost streaming revenue for Scary Movie for the other platforms. (*See* ECF 69, Suppl. Wilson Decl. ¶ 4.)

Plaintiff then tripled the estimated lost streaming revenues of $360.63 to account for Plaintiff's lost opportunity to promote Scary Movie while the song was available on streaming services (such as through live performances, word of mouth, and interviews), resulting in $481.90 in lost revenue for streaming on Spotify and $600.00 in lost revenue for streaming on other platforms. (*See id.*) For Scary Movie, Plaintiff estimated lost streaming revenue of $1,081.90. Plaintiff did not explain how it got from $1,081.90 to the claimed damages of $10,000.00 for lost streaming revenue.

This approach has several flaws. To begin with, it is unclear whether what Plaintiff represents were Scary Movie's pre-Take-Down streams on Spotify in fact included streams after the album was re-uploaded. Plaintiff's screenshots of the total Spotify streams for each song, used in the first half of its formula, are the total streams to date as of April 9, 2025. (*See id.* ¶¶ 3(b)-(c).) This was years after the Take-Down Period began in or around January 2021. (*See* ECF 4, Compl. ¶¶ 98-100.) Plaintiff was also unable to determine exact dates and timeframes

---

2 Plaintiff states that the difference is the likely number of streams Scary Movie would have had during the period it was improperly taken down. (*See* ECF 69, Suppl. Wilson Decl. ¶¶ 3(b)-(c), 4.)

3 Plaintiff calculates this amount as its total streaming revenue for one Frosty the Doeman account divided by the total number of streams for that same account for all songs. (*See id.* ¶¶ 4, 18.)

4 Plaintiff does not have the data for the other platforms and therefore is limited to estimates. (*See id.* ¶¶ 3-4.)

for streams that occurred earlier than April 9, 2024. (*See* ECF 69, Suppl. Wilson Decl. ¶ 3(a).)

Additionally, Plaintiff multiplied the projected streaming revenue by three to account for

increasing popularity of the songs (*see id.* ¶ 4) but provided no basis for using a multiplier of

three. And Plaintiff does not explain how it got from $1,081.90 in estimated lost revenue for

Scary Movie to $10,000.00 in lost revenue for the album.

     In assessing damages for copyright infringement, courts must necessarily engage in

some degree of speculation, and having some difficulty in quantifying the damages attributable

to infringement should not bar recovery. *See On Davis v. Gap, Inc.*, 246 F.3d 152, 166-67 (2d Cir.

2001). However, there must be some justification provided by the plaintiff for the assumptions

used in estimating damages. *See Viral DRM LLC v. Navez*, No. 23-CV-6598 (JSC), 2025 WL

834498, at *3-5 (N.D. Cal. Mar. 17, 2025) (holding that the plaintiff was not entitled to its

requested damages because the evidence provided "failed to show [that the plaintiff] suffered

any harm as a result of Defendant's false counternotification" in violation of 17 U.S.C. § 512(f));

*see also Terry v. Masterpiece Advert. Design*, No. 17-CV-8240 (NRB), 2018 WL 3104091, at *4

(S.D.N.Y. June 21, 2018) (explaining that a damages award for copyright infringement under 17

U.S.C. § 504(b) "must rely on some factual basis rather than undue speculation").

     I provided Plaintiff with a chance to explain its assumptions in a supplemental filing, but

Plaintiff's submission of October 28, 2025 (ECF 77) did not provide the required clarification

and, indeed, did not address any of my questions relating to damages for lost streaming

revenue. While assumptions are necessary in calculating the damages for lost streaming

revenue, in the absence of any explanation of the basis for Plaintiff's assumptions, Plaintiff has

at best demonstrated damages for lost streaming revenue of $360.63.

B.    <u>Damages for Lost Performances</u>

Travon Carr is a club promoter in Martinsburg, West Virginia. In 2021, due to capacity

restrictions at live performance venues during the pandemic, Carr livestreamed performances

from his bar on digital service providers such as Spotify and Apple Music. (*See* ECF 69-1, Carr

Decl. at 1.)[5] Wilson approached Carr about performing at a livestreamed show in May 2021.

(*See id.*) Plaintiff had music available on streaming services that had been unaffected by

George's Take-Down requests. (*See id.*) Carr turned Wilson down because he thought Plaintiff's

available music was not commercial enough. (*See id.* at 2-3.) Wilson asked Carr to listen to Scary

Movie, but Carr was "unable to find it." (*Id.*)

Wilson reached out to Carr again about performing at a livestreamed show in July 2021.

(*See id.* at 3.) Plaintiff directed Carr to YouTube, where Scary Movie was available despite

George's Take-Down requests. (*See id.*) Carr stated that he liked the song but was wary of

booking Plaintiff because he did not want legal strikes on the livestreamed show. (*See id.*) Carr

claims he would have booked Wilson for eight shows between June and August 2021 if

Plaintiff's music had been available. (*See id.*) Carr estimates Plaintiff would have earned

$12,000.00 for the eight shows and that if he had booked Wilson for the first eight shows, he

would have hired Wilson to perform at larger venues that would have allowed Plaintiff to earn

an additional $8,000.00, for a total of $20,000.00. (*See id.*)

---

[5]    *See Palace Skateboards Grp. v. Glob. Outlet Store*, No. 20-CV-6108 (GBD) (SN), 2024 WL
4534668, at *3 (S.D.N.Y. Sept. 6, 2024) ("A court may determine the appropriate damages on
the basis of affidavits and other documentary evidence as long as the court has ensured that
there is a basis for the damages specified in the default judgment.") (quoting *Transatlantic
Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d
Cir. 1997)).

Here, Carr's declaration supports a conclusion that Plaintiff's damages were attributable to the Take-Down requests (*see* ECF 60, Proposed Findings ¶ 8), so that only the amount is speculative. Accordingly, damages for lost performances would be recoverable by Plaintiff if Plaintiff can show that the estimated damages are based on reasonable assumptions and that Plaintiff was legally entitled to such damages. *See On Davis*, 246 F.3d at 166-67 (noting that, in assessing damages for copyright infringement, courts must necessarily engage in some degree of speculation, so that having some difficulty in quantifying the damages attributable to infringement should not bar recovery, but that uncertainty as to whether any damages were attributable to the infringement as opposed to another cause can preclude recovery).

Carr's declaration likewise supports a conclusion that Wilson would have earned $20,000.00 in the absence of George's Take-Down requests (*see* ECF 60, Proposed Findings ¶ 8). However, in the Proposed Findings, Plaintiff said it was entitled to $15,000 in damages for lost performances. (*See* ECF 60, Proposed Findings ¶ 8.) Plaintiff does not explain the basis on which it would have been entitled to a portion of Wilson's $20,000 compensation for performing. Plaintiff and Wilson are legally distinct. Plaintiff has not demonstrated that it (as distinct from Wilson) is entitled to lost performance damages. *See Cavalea v. Dr. Jane*, No. 10-CV-4602 (JS) (WDW), 2011 WL 795891, at *1 n.1 (E.D.N.Y. Feb. 28, 2011) (rejecting the plaintiff's requested relief for his family members' time lost and physical and emotional pain, because the plaintiff could not "assert causes of action or claim damages based on a third party's alleged injury"); *McCracken v. Natale*, No. 04-CV-5456 (JS) (ARL), 2008 WL 5274317, at *4 (E.D.N.Y. Dec. 17, 2008) ("Plaintiff lacks standing to sue for these injuries, as they involve harm allegedly committed to third-parties, and not to Plaintiff."); *see also Doe v. Hochul*, 139 F.4th 165, 177

(2d Cir. 2025) ("Typically, a plaintiff will have standing only to assert his or her own legal rights and interests and may not rest a claim to relief on the legal rights or interests of others.").

Plaintiff's supplemental brief (ECF 77) does not satisfactorily address the basis for Plaintiff's claim that it is entitled to a portion of the damages suffered by Wilson from lost performance opportunities. Plaintiff argued that the Section 512(f) of the DMCA defines damages broadly; pointed out that the Carr Declaration demonstrates the causal relationship between the Take-Down and the inability of Wilson to secure bookings; and asserted that music performances are more lucrative than streaming songs. (*Id.* at 8-9.) But Plaintiff does not explain why Plaintiff – the record label owned by Wilson – would be entitled to revenues from Wilson's performances. Such could be the case, for example, if Plaintiff and Wilson had a contractual arrangement entitling Plaintiff to a portion of Wilson's revenues from performances.

In the absence of such an explanation, Plaintiff has failed to establish any damages it suffered as a result of Wilson's lost performances.

C.    Damages for Lost Time

In the months following George's Take-Down requests, Wilson worked to have Plaintiff's music reuploaded to streaming platforms. (*See* ECF 60, Proposed Findings ¶ 9.) Wilson spent a significant amount of time conducting research and inquiries to determine how to reverse the Take-Down, which was ultimately achieved. (*See id.*) Separate from his recording, Wilson runs a business that earns him $130.00 per hour. (*Id.*) Plaintiff estimated that Wilson spent more than 250 hours working to reverse the George's Take-Down requests, and Plaintiff argued that Wilson would have otherwise spent these hours running his business. (*Id.*) Plaintiff requested

$32,500.00 in damages for the time Wilson spent to have Plaintiff's music re-uploaded ($130.00 * 250). (*Id.*)

Plaintiff's request for lost time seeks damages to Wilson and not to Plaintiff. As the Proposed Findings explain, Wilson runs a business separate from his music career, which is therefore separate from Plaintiff's business. Plaintiff failed to explain how it benefits from Wilson, one of its recording artists, earning a salary from a position that is separate from Plaintiff's recording label. To the extent Wilson's efforts to reverse the Take-Down resulted in lost time that could have been used to earn a salary, that is a harm to Wilson and not to Plaintiff, which Plaintiff cannot recover. *See Cavalea,* 2011 WL 795891, at *1 n.1; *McCracken*, 2008 WL 5274317, at *4; *Hochul*, 139 F.4th at 177.

I provided Plaintiff with an opportunity to provide an explanation for how it was harmed by Wilson's lost earnings, but Plaintiff's supplemental submission (ECF 77) did not answer my question. Instead, Plaintiff reiterated that the Section 512(f) of the DMCA defines damages broadly and encompasses both losses as a result of the takedown and losses as a result of replacing the removed material, including lost time. (*Id.* at 2.) In support, Plaintiff cited *Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1018 (N.D. Cal. 2015). In *Automattic*, however, the Court awarded lost-time damages to the author of the content that was taken down, who was the copyright holder, as well as to the website that hosted the content, which was a service provider that removed content and thus eligible for damages under the statute. *See id.* at 1030-31. While Wilson performed the songs at issue, he is not the owner of the intellectual property and is not a service provider who removed content. *Automattic* therefore does not support an award of damages to Plaintiff for Wilson's lost earnings from an unrelated business.

16

In support of the request for damages for Wilson's lost earnings, Plaintiff also cites *California Beach Co., LLC v. Han Xian Du*, No. 19-CV-8426 (YGR) (LB), 2020 WL 6276987, at *8 (N.D. Cal. Aug. 13, 2020) ("*California Beach I*"), *report and recommendation adopted*, 2020 WL 6271225 (N.D. Cal. Oct. 26, 2020). The plaintiff in *California Beach I*, however, sought damages for lost time based on his imputed salary for work at California Beach, *id.*, presumably because if he had not been addressing the takedown he would have performed other work for California Beach; California Beach, the holder of the license to the patent at issue in that case, thus suffered a loss as a result of the plaintiff's work on addressing the takedown. Plaintiff here has not explained how it was comparably harmed by Wilson's lost earnings from an unrelated business.[6]

Plaintiff provided information on the salary earned by entry-level staff in the music-rights management industry, stating that, based on internet research, such employees earn between $30.85 and $56.25 per hour. (ECF 77, Pl.'s Suppl. Brief at 4.) The logic of *Automattic* and *California Beach I* suggests that it could have been appropriate to award Plaintiff damages for Wilson's salary *from Plaintiff* for addressing George's Take-Down – but Plaintiff has submitted no evidence suggesting that Wilson was paid a salary by Plaintiff. *Automattic* further suggests that, had Plaintiff hired a music-rights management consultant to assist with addressing George's Take-Down, the amounts paid to that consultant could have been

---

[6]     Additionally, while *California Beach I* does state that caselaw supports recovery of lost time damages, the case also notes that recovery of time spent addressing a takedown and lost sales "appears to be a double counting of harm." *Id.* In a subsequent ruling, *California Beach Co., LLC v. Han Xian Du*, No. 19-CV-8426 (YGR) (LB), 2020 WL 6260013, at *4 (N.D. Cal. Oct. 6, 2020), *report and recommendation adopted*, 2020 WL 6271225 (N.D. Cal. Oct. 26, 2020), the court awarded damages for lost profits but not lost time.

recoverable. *See Automattic*, 82 F. Supp. 3d at 1031. But Plaintiff did not hire an outside

consultant; moreover, salaries paid to music-rights management consultants do not necessarily

reflect the cost of hiring such a consultant.

Accordingly, I conclude that Plaintiff has failed to support any damages for lost time.

D.    <u>Attorneys' Fees and Costs</u>

District courts determining reasonable attorneys' fees in Section 512 false take-down

cases look to the factors for assessing reasonable attorneys' fees in copyright cases, which are

set out in *Fogerty v. Fantasy, Inc.,* 510 U.S. 517 (1994). *See Samsonite IP Holdings S.àr.l. v.

Shenzhen Liangyiyou E-Com. Co., Ltd.*, No. 19-CV-2564 (PGG) (DF), 2021 WL 9036273, at *10

(S.D.N.Y. Apr. 27, 2021), *report and recommendation adopted*, 2023 WL 8805645 (S.D.N.Y. Dec.

20, 2023). Those factors include (1) the frivolousness of the non-prevailing party's claims or

defenses; (2) the party's motivation; (3) whether the claims or defenses were objectively

unreasonable; and (4) compensation and deterrence. *See Bryant v. Media Right Prods., Inc.*, 603

F.3d 135, 144 (2d Cir. 2010) (citing *Fogerty*, 510 U.S. at 534 n.19). "The third factor – objective

unreasonableness – should be given substantial weight." *Bryant*, 603 F.3d at 144.

Plaintiff seeks $2,500.00 in out-of-pocket fees paid to DMCA counsel, $400.00 in pre-

filing services in connection with George's Take-Down, and $1,202.00 in taxable costs. (*See* ECF

60, Proposed Findings ¶¶ 10, 30, 35-37.) Although Plaintiff does not provide an invoice for

DMCA counsel and the prefiling services, this request appears to be reasonable. Plaintiff has

substantiated the cost of DMCA counsel with a sworn declaration that it paid: $150.00 "for

assistance with effectuating a counternotice" to George's Take-Downs; $250.00 to consult

"another private attorney" about George's Take-Downs; and $2,500.00 "for substantial

assistance in research and figuring out my appropriate courses of action on or around April

2022, prior to their drafting of the complaint." (*Id.* ¶ 10; ECF 60-2, Wilson Decl. ¶¶ 4-5.) *See also*

*Shamir v. Anchor-Int'l Found., Inc.*, No. 10-CV-0725 (PGG) (DF), 2013 WL 4008635, at *5-6, *13-

14 (S.D.N.Y. July 30, 2013) (adopting a recommendation to deny the plaintiff's request for an

award of attorneys' fees because the plaintiff did not provide "either a sworn or unsworn

statement representing" the basis of the requested amount). The taxable costs are also

reasonable, because $800.00 was for the process server (*see* ECF 60-1, Grimm Decl. at 11) and

$402.00 was for the filing fee (ECF 60, Proposed Findings ¶ 36).

Plaintiff seeks $57,490.00 in attorneys' fees, which includes $4,750.00 for the

supplemental declarations. (*See id.* ¶ 34; ECF 69-2, Suppl. Grimm Decl.; ECF 77, Supp. Brief at 7.)

Plaintiff's lead counsel, Andrew Grimm, is Senior Counsel for Intake & Litigation at the Digital

Justice Foundation, a non-profit public interest law firm. Grimm graduated from Stanford Law

School, was admitted to the Washington State Bar in 2016, and previously worked at the law

firm K&L Gates. Mr. Grimm worked on this case with Megan Keenan, Executive Director and

lead attorney at the Information Dignity Alliance, a non-profit law firm that focuses on digital

information practices. Keenan graduated from Lewis and Clark Law School and was admitted to

practice law in Oregon in 2020. Grimm billed 52.4 hours on this case at an hourly rate of $450;

Keenen billed 72.9 hours of work on this case at an hourly rate of $400. (ECF 60-1, Grimm Decl.

¶¶ 1-3.)

Courts in this District generally approve hourly rates ranging from $400 to $735 for

partners and from $200 to $450 for associates in copyright cases. *See Samsonite IP Holdings*,

2021 WL 9036273, at *14 (collecting cases). Grimm's and Keenan's hourly rates are at the high

end of this District's accepted ranges for their positions and experience, which seems

comparable to experienced associates. I respectfully recommend reducing Grimm's hourly rate to $400, and Keenan's hourly rate to $300. *See id.* (finding that an hourly rate of $400 for an associate with nine years of experience was reasonable); *Int'l Council of Shopping Ctrs., Inc. v. Info Quarter, LLC*, No. 17-CV-5526 (AJN), 2019 WL 2004029, at *6 (S.D.N.Y. May 7, 2019) (finding that an hourly rate of $300 was reasonable for two partners with ten years of experience).

In evaluating whether billed hours are reasonable, a court considers "not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Durso v. Mod. Food Ctr., Inc.*, No. 17-CV-7324 (LAK) (GWG), 2018 WL 3019112, at *6 (S.D.N.Y. June 18, 2018) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)). "Because attorney's fees are dependent on the unique facts of each case, the resolution of this issue is committed to the discretion of the district court." *Durso*, 2018 WL 3019112, at *6 (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992)). In exercising this discretion, the district court should look "to its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Durso*, 2018 WL 3019112, at *6 (quoting *Clarke*, 960 F.2d at 1153).

Plaintiff's counsel billed a combined 132.8 hours on this case; both attorneys appear to be seeking recovery of their total hours spent on this case, including work on the dismissed claims against DistroKid. It is unreasonable for George to be required to pay the attorney fees for time spent on dismissed claims against DistroKid. *See JTH Tax LLC v. Sanchez*, No. 22-CV-6160 (AS) (JLC), 2023 WL 6813449, at *7 (S.D.N.Y. Oct. 16, 2023) (reducing request for attorneys' fees after default judgment for the plaintiff's billing records that did not distinguish

whether hours works were for claims against defaulting defendant instead of non-defaulting defendants). I respectfully recommend reducing counsel's combined compensable time to 40 hours, in the same ratio as their billed time (16 hours for Grimm and 24 hours for Keenan). *See Int'l Council of Shopping Ctrs.*, 2019 WL 2004029, at *6 (finding reasonable 36.71 hours spent on an intellectual property case in which defendant defaulted).

Plaintiff's counsel requests additional fees for 2.5 hours of Grimm's preparation of Plaintiff's October 28, 2025 supplemental brief. (ECF 77, Supp. Brief. at 7.) I find this number of hours to be reasonable, considering that Grimm "has spent far more than 2.5 hours" on this submission. (*Id.*) At the reduced hourly rate of $400.00 recommended for Grimm, this adds an additional $1,000.00 to Plaintiff's attorneys' fees award.

Accordingly, I respectfully recommend an award of $14,600.00 in attorneys' fees, plus $4,102.00 in costs, for a total of $18,702.00 in attorneys' fees and costs.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that judgment be entered against George in favor of Plaintiff, with Plaintiff to be awarded $19,062.63, consisting of the sum of (1) $360.63 in damages; and (2) $14,600.00 in attorneys' fees, plus $4,102.00 in costs, for a total of $18,702.00 in attorneys' fees and costs.

DATED:  January 8, 2026
        New York, New York

Respectfully Submitted,

**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION**

The parties shall have fourteen days (including weekends and holidays) from service of this report and recommendation to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. Plaintiff shall promptly serve a copy of this report and recommendation on Defendant George by mail and email at Defendant's last known addresses and shall file proof of such service on the docket on the day such service is made. A party may respond to another party's objections within fourteen days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections and responses to objections must be addressed to Judge Garnett.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).